IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| DAVID FARRIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. |
| | ) 08-0733-CV-W-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT,
BUT GRANTING PLAINTIFF'S REQUEST FOR REMAND**

Plaintiff David Farris seeks review of the final decision of
the Commissioner of Social Security denying plaintiff's
application for disability benefits under Title II of the Social
Security Act ("the Act"). Plaintiff argues that (1) the ALJ
failed to consider the side effects of plaintiff's medication in
assessing credibility, and (2) the vocational expert never
addressed the conflict between her testimony and the Dictionary
of Occupational Titles. I find that the ALJ erred in failing to
obtain an explanation from the vocational expert as to the
conflict between her testimony (that a person could be a ticket
taker or a retail marker if he is unable to repetitively use his
hands) and the Dictionary of Occupational Titles (that a ticket
taker and a retail marker must be able to frequently handle).
Therefore, although plaintiff's motion for summary judgment is
denied, his request for remand will be granted.

## I. BACKGROUND

On May 31, 2005, plaintiff applied for disability benefits alleging that he had been disabled since March 14, 2005. Plaintiff's disability stems from fibromyalgia and pain in his back and neck. Plaintiff's application was denied on July 20, 2005. On December 27, 2007, a hearing was held before an Administrative Law Judge. On January 18, 2008, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On September 10, 2008, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in

2

opposition to the Commissioner's decision.  Universal Camera
Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876
F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into
consideration the weight of the evidence in the record and apply
a balancing test to evidence which is contradictory."  Wilcutts
v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v.
Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It
means such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion."  Richardson v. Perales, 402
U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th
Cir. 1991).  However, the substantial evidence standard
presupposes a zone of choice within which the decision makers can
go either way, without interference by the courts.  "[A]n
administrative decision is not subject to reversal merely because
substantial evidence would have supported an opposite decision."
Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of
proving he is unable to return to past relevant work by reason of
a medically-determinable physical or mental impairment which has
lasted or can be expected to last for a continuous period of not
less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the

3

plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

>  Yes = not disabled.
>  No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>  No = not disabled.
>  Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

>  Yes = disabled.
>  No = go to next step.

4

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Amy Salva, in addition to documentary evidence admitted at the hearing.

### A. *EARNINGS RECORD*

The record shows that plaintiff earned the following income from 1978 through 2007, shown in actual and indexed figures:

| Year | Actual Earnings | Indexed Earnings |
|------|-----------------|------------------|
| 1978 | $ 2,356.57 | $ 7,604.79 |
| 1979 | 1,776.21 | 5,270.85 |
| 1980 | 3,573.00 | 9,726.65 |
| 1981 | 2,303.02 | 5,696.05 |
| 1982 | 10,495.59 | 24,604.18 |
| 1983 | 1,163.03 | 2,599.77 |
| 1984 | 9,448.57 | 19,948.17 |
| 1985 | 15,853.77 | 32,103.29 |
| 1986 | 10,527.52 | 20,703.34 |
| 1987 | 2,196.97 | 4,061.52 |

5

| 1988 | 11,907.52 | 20,980.05 |
|------|-----------|-----------|
| 1989 | 4,845.81 | 8,212.73 |
| 1990 | 7,270.50 | 11,778.08 |
| 1991 | 1,329.53 | 2,076.44 |
| 1992 | 18,938.09 | 28,127.90 |
| 1993 | 4,444.05 | 6,544.27 |
| 1994 | 0.00 | 0.00 |
| 1995 | 5,423.00 | 7,477.40 |
| 1996 | 12,384.45 | 16,279.90 |
| 1997 | 14,594.50 | 18,127.36 |
| 1998 | 16,829.03 | 19,863.18 |
| 1999 | 14,632.38 | 16,358.84 |
| 2000 | 15,062.32 | 15,957.08 |
| 2001 | 30,148.43 | 31,195.17 |
| 2002 | 34,206.17 | 35,042.35 |
| 2003 | 34,810.51 | 34,810.51 |
| 2004 | 34,385.92 | 34,385.92 |
| 2005 | 8,927.81 | 8,927.81 |
| 2006 | 3,900.00 | 3,900.00 |
| 2007 | 3,900.00 | 3,900.00 |

(Tr. at 53-54, 214).

**B.    *SUMMARY OF MEDICAL AND ADMINISTRATIVE RECORDS***

On October 13, 2004, plaintiff presented to neurologist Steven M. Arkin, M.D., with complaints of pain in his hands and feet (Tr. at 155, 157).  On examination, plaintiff was alert, oriented, and in no apparent distress (Tr. at 156, 158).

Case 4:08-cv-00733-REL   Document 13   Filed 10/20/09   Page 6 of 35

Although he had some diminished sensation in the plantar aspect of his toes, plaintiff had normal gait and strength, Romberg's sign[1] was negative, and his reflexes were intact (Tr. at 156). Dr. Arkin assessed activity-driven swelling and dysesthesias[2] in plaintiff's hands, and he prescribed Ultracet,[3] Neurontin,[4] and Trileptal[5] (Tr. at 156).

The following week, on October 21, 2004, plaintiff presented to orthopedist Michael M. Hall, M.D., with complaints of pain in his hands (Tr. at 161). Plaintiff reported, however, that he could play the guitar and perform electronics repair (Tr. at 161). Dr. Hall noted that previous examinations by a neurologist and rheumatologist were negative (Tr. at 161). On examination, plaintiff had full range of motion, no tenderness, and Tinel's[6]

---

[1]An indication of loss of the sense of position in which the patient loses balance when standing erect, with feet together and eyes closed.

[2]Impairment of sensation, especially that of touch, or a condition in which an unpleasant sensation is produced by ordinary stimuli.

[3]A narcotic-like pain reliever.

[4]Treats seizures and nerve pain.

[5]Decreases nerve impulses that cause seizures.

[6]An examination test that is used by doctors to detect an irritated nerve. Tinel's sign is performed by lightly banging (percussing) over the nerve to elicit a sensation of tingling or "pins and needles" in the distribution of the nerve.

7

sign was negative (Tr. at 161). Dr. Hall assessed overuse hands syndrome and prescribed Relafen, a non-steroidal anti-inflammatory (Tr. at 162).

On December 9, 2004, magnetic resonance imaging ("MRI") of plaintiff's back showed mild degenerative changes with some osteophyte formation, but no stenosis (narrowing) and normal vertebral body height (Tr. at 158-59).

On January 13, 2005, plaintiff presented to Stephen G. Charapata, M.D., with complaints of pain in his hands, neck, and back (Tr. at 150). Plaintiff had normal grip, normal reflexes, and normal range of motion (Tr. at 150). Dr. Charapata assessed cervical degenerative disc disease and radiculopathy, and he administered a cervical epidural steroid injection (Tr. at 150).

On January 27, 2005, and February 10, 2005, plaintiff returned to Dr. Charapata for cervical epidural steroid injections (Tr. at 148-49). He reported that the injections relieved his neck pain by 25 percent (Tr. at 148-149). Dr. Charapata wrote that plaintiff was "continuing to make progress" (Tr. at 148-49).

On February 15, 2005, plaintiff presented to Edward Wortham, M.D., with complaints of pain in his neck (Tr. at 143). He reported that cervical epidural steroid injections were effective at relieving his neck pain (Tr. at 143). Dr. Wortham assessed

8

cervical disc disease with radiculopathy, and continued plaintiff's medications (Tr. at 143).

On March 10, 2005, plaintiff returned to Dr. Charapata, reporting that epidural steroid injections had relieved his neck pain by 60 percent (Tr. at 147).  Two weeks later, and one week after his alleged onset of disability, on March 22, 2005, plaintiff told Dr. Wortham that epidural steroid injections were not effective at controlling his neck pain (Tr. at 141).  On examination, plaintiff had normal reflexes and no neurological deficits (Tr. at 141).

The following month, on April 14, 2005, plaintiff returned to Dr. Charapata with continued complaints of pain in his neck. Dr. Charapata wrote that he believed that plaintiff's reported neck pain may be the result of a repetitive motion injury, and that he "did not have a whole lot more to offer [plaintiff]" (Tr. at 146).

On April 25, 2005, plaintiff presented to neurologist Paul O'Boynick, M.D., with complaints of pain in his hands and neck (Tr. at 151, 153).  Plaintiff had slightly decreased sensory in his right hand, but normal strength and normal reflexes (Tr. at 151, 153).  An MRI of plaintiff's cervical spine showed only slight bulging at C5-6 and C6-7 (Tr. at 151, 153).  Dr. O'Boynick deferred diagnosis and remarked that plaintiff did not have

cervical radiculopathy (Tr. at 151, 153).

On May 2, 2005, plaintiff returned to Dr. Wortham with complaints of pain in his hands and feet (Tr. at 140). Plaintiff denied weakness and reported that sleeping with a "special pillow" relieved his neck pain "quite a bit" (Tr. at 140). On examination, plaintiff was alert, oriented, and in no acute distress; his reflexes were normal; and he had no weakness in his arms or legs (Tr. at 140). Dr. Wortham continued plaintiff's medications (Tr. at 140).

On May 19, 2005, plaintiff returned to Dr. Charapata for a follow-up (Tr. at 145). Dr. Charapata believed that plaintiff was not a candidate for surgery (Tr. at 145).

On May 31, 2005, plaintiff applied for disability benefits.

On June 2, 2005, plaintiff presented to Paul L. Katzenstein, M.D., with complaints of pain in his hands, arms, and feet (Tr. at 137). Plaintiff reported, however, that he did not have trouble playing the guitar (Tr. at 137). On examination, plaintiff was alert, oriented, well developed, well nourished, and in no apparent distress; he had normal strength and coordination; and his bones, joints, and muscles were negative for abnormalities (Tr. at 137-38). Dr. Katzenstein assessed arthralgia (pain in the joints), dysesthesia,[7] and cervical

---

[7]Impairment of any of the senses, especially touch.

Case 4:08-cv-00733-REL   Document 13   Filed 10/20/09   Page 10 of 35

osteoarthritis, but he stated that he did not know the actual source of plaintiff's reported pain and that it was not cervical radiculopathy (Tr. at 138).

On June 7, 2005, plaintiff returned to Dr. Wortham with continued complaints of pain in his arms and legs (Tr. at 136). Plaintiff was alert, oriented, and in no acute distress; he had no weakness in his arms or legs; and he was negative for neurological deficits (Tr. at 136).

On June 21, 2005, plaintiff completed a Function Report in connection with his application for disability benefits (Tr. at 91). He wrote at length, by hand, that he spent his day reading, preparing meals, watching television, doing laundry, playing guitar, and typing on his computer (Tr. at 91). He also wrote that he could bathe, dress, drive, cook, wash dishes, shop for groceries, do yard work, mow his lawn, ride a bicycle, and walk without an assistive device (Tr. at 92-94). Plaintiff wrote that he could pay bills, count change, handle a savings account, use a checkbook, cooperate with others, and follow instructions without difficulty (Tr. at 94-96). He wrote that he enjoyed writing music and "jamming" with his friends during his free time (Tr. at 95).

Plaintiff reported that "I am irritable and am not happy having to live my life like this. At one time I planned to play

11

professionally.  Now I am fighting to continue playing at all (for my own sanity)." (Tr. at 96).  He reported that his pain pills make him cranky and short tempered (Tr. at 96).  Plaintiff reported that he can follow written instructions "very well" and that he "may need to write things down" when given oral instructions (Tr. at 96).  He handles stress well; and as far as changes in routine, he usually "roll[s] with the punches pretty well" (Tr. at 97).

Two days later, on June 23, 2005, plaintiff returned to Dr. Charapata with continued complaints of pain in his hands and feet (Tr. at 144).  Dr. Charapata again noted that he did not know what was causing plaintiff's reported pain, and he prescribed Cymbalta (anti-depressant) (Tr. at 144).

On July 20, 2005, plaintiff's application for disability benefits was denied.

Eighteen months after his last medical appointment, on December 5, 2006, plaintiff presented to Dr. Stephen Dorsch (Tr. at 178).  Plaintiff reported a history of fatigue and said that he was taking hydrocodone (narcotic) and amitriptyline (antidepressant); he reported no side effects (Tr. at 178).  On examination, plaintiff was alert, cooperative, and in no apparent distress (Tr. at 178).  Although he had some tenderness in his elbows, wrists, and legs, plaintiff had normal strength, no

edema, full range of motion, and no neurological deficits (Tr. at 178). Dr. Dorsch noted that plaintiff was taking over-the-counter supplements and "has rather extensively researched fibromyalgia. He now primarily has pain [in] his elbows, forearm, wrists, hands and legs. He has some neck and shoulder pain as well." Dr. Dorsch assessed fibromyalgia, chronic fatigue, and allergic rhinitis, and he prescribed Claritin (Tr. at 178). He told plaintiff to use his hydrocodone "on a very limited basis".

During follow-up with Dr. Dorsch on January 2, 2007, plaintiff reported that amitriptyline blurred his vision (Tr. at 176). He had stopped taking it on December 16, 2006.

On March 13, 2007, plaintiff saw Dr. Dorsch for a following up (Tr. at 175).

> Apparently, he is continuing to see Dr. Wortham for primary care, which brings up the question as to why he is being seen in our office and this was discussed with him at length today. . . . We had previously discussed possible referral for pain management, rheumatology and neurology, and he has been seen by neurology at KU. Apparently the evaluation was essentially negative for any pathology at that time. . . . He apparently had been in Colorado recently and states he actually was doing much better when he was there, but for the last couple of days since he has been back he feels worse. He denies palpitations, chest pressure, cough, dyspnea, headache or visual disturbance. He wears glasses. He denies urinary or bowel symptoms. . . .

> He places his pain at 10; although, he does not appear to be in that much distress; he sat comfortably throughout his

13

visit with me here today and he had no difficulty with getting up from a seated position or ambulating when he left the office, in fact, he was ambulating quite quickly.

On March 19, 2007, plaintiff returned to Dr. Wortham for a follow-up (Tr. at 185). Plaintiff was alert, oriented, and in no acute distress; his extremities were normal; and he had no focal lateralizing findings (Tr. at 185). Dr. Wortham prescribed Vicodin (narcotic) and told plaintiff to follow-up in three months (Tr. at 185).

On April 5, 2007, plaintiff presented to Alan Salkind, M.D., for an infectious disease consultation (Tr. at 170). On examination, plaintiff had normal range of motion, no neurological deficit, and his extremities were negative for swelling (Tr. at 171). Dr. Salkind assessed possible fibromyalgia and recommended follow-up with a rheumatologist (Tr. at 171).

During a follow-up with Dr. Wortham on May 11, 2007, plaintiff reported that Lyrica[8] relieved his pain "quite a bit," and he requested a refill (Tr. at 184).

On July 6, 2007, plaintiff returned to see Dr. Dorsch (Tr. at 174). Plaintiff said that he was "doing better since he ha[d] been taking Lyrica," and that amitriptyline helped him sleep; he again reported no side effects from his medication (Tr. at 174).

_____

[8]Treats fibromyalgia by affecting chemicals in the brain that send pain signals across the nervous system.

14

Plaintiff denied palpitations, chest pressure, nausea, diaphoresis (excessive sweating), headache, visual disturbance, urinary or bowel symptoms, significant weakness or numbness, melena (black tarry feces), hematochezia (passage of bloody stool), or hematuria (blood in the urine). Plaintiff had normal thyroid function, normal CBC (complete blood count), slightly elevated glucose (106 with 100 being normal), normal lipids (cholesterol and other fat in the blood), and normal C-reactive protein (measuring inflammation). On examination plaintiff's cranial nerves were intact, he had no neurological deficit, and his extremities were negative for edema (Tr. at 174). He had normal muscle mass and tone, and his neurological examination was within normal limits. Although plaintiff reported his pain as a 6 out of 10, he stated that he was "not in that much discomfort at this particular time." Dr. Dorsch observed that plaintiff was alert and did not appear to be in "any distress at all." Dr. Dorsch continued plaintiff's medications (Tr. at 174).

On July 19, 2007, plaintiff presented to Amr Edrees, M.D.,[9] with complaints of pain in his hands, neck, and back (Tr. at 166). Plaintiff went over his history, including his belief that the first two epidural steroid injections in his neck improved

_____

[9]I assume Dr. Edrees is a rheumatologist, as the records indicate multiple times that plaintiff was scheduled to see a rheumatologist on July 19, 2007; although Dr. Edrees's records do not indicate a specialty.

his symptoms, but the final two did not provide further improvement. Although he had some tenderness around his ribs, epicondyle, trapezius, and supraspinatus, plaintiff had normal range of motion in his wrists, elbows, shoulders, and knees; he could make full fists; and he had no swelling, edema, effusion, or instability in his joints or extremities (Tr. at 167). Dr. Edrees assessed possible fibromyalgia and neck pain due to degenerative spine disease, and he prescribed Lyrica (Tr. at 197).

During a follow-up with Dr. Edrees on August 30, 2007, plaintiff reported that Lyrica was effective at relieving his pain (Tr. at 164-165). On examination, plaintiff had normal range of motion in his wrists, elbows, and shoulders; and he could make full fists (Tr. at 165). He had mild tenderness over the medial aspect of his right knee. Dr. Edrees suggested an EMG and nerve conduction study.

On October 27, 2007, plaintiff completed two Disability Reports in connection with his application for disability benefits (Tr. at 71, 77, 112). He wrote that he had trouble gripping a toothbrush and razor because of pain in his hands and fingers (Tr. at 71, 77-78). He also wrote that he was experiencing side effects from his prescription pain medication, including sleepiness, dizziness, stomach discomfort,

16

constipation, and erectile dysfunction (Tr. at 73). Despite these side effects, plaintiff wrote that his medication was effective at relieving his pain and that he could continue working as an amplifier repair technician, earning enough to pay for food, utilities, and health insurance (Tr. at 74, 84, 112). Finally, plaintiff wrote that a neurologist had told him that there was nothing wrong with him (Tr. at 88).

More than one year after he last saw plaintiff, on July 16, 2008, Dr. Wortham wrote a letter to whom it may concern (Tr. at 190). He stated that plaintiff had "focused pain" in his hands and feet that "severely" impaired his ability to use his hands, ambulate, and complete his daily activities (Tr. at 190). Dr. Wortham also stated that plaintiff could not sit for longer than 20 minutes, stand longer than ten minutes, and needed to lie down three to four hours per day, making "gainful employment difficult if not impossible" (Tr. at 190). Finally, Dr. Wortham stated that plaintiff did not have the "stamina" to perform "any sort of 40 hour per week job even if he were to have a 'sit down' job" (Tr. at 190).

## C. SUMMARY OF TESTIMONY

During the December 27, 2007, hearing, plaintiff testified; and Amy Salva, a vocational expert, testified at the request of the ALJ.

17

1.  **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 46 years of age and is currently 47 (Tr. at 193).  He has a high school education and two years of college in electronics (Tr. at 193-194).  Plaintiff lives in a small house which holds his washer, dryer, and refrigerator in the basement (Tr. at 204).

Plaintiff suffers from chronic fatigue fibromyalgia (Tr. at 198).  If he walks down one flight of stairs, he feels as though he has walked 20 miles (Tr. at 198).  Even walking on a flat surface causes pain (Tr. at 199).

When plaintiff wakes up in the morning, he takes one and a half pain pills and waits about 40 minutes before he actually gets up (Tr. at 199).  Plaintiff's pain pills cause problems with thinking (Tr. at 200).  He takes at least four hydrocodone and Lyrica every day (Tr. at 200).  Plaintiff has trouble sleeping because he cannot turn his brain off (Tr. at 200).  He takes Amitriptyline, Cyclobenzaprine, Flexeril, and Valium to help him sleep (Tr. at 201).  Plaintiff's medications also cause problems with his memory (Tr. at 202).  For example, he would have to "think real hard" to recall what he did yesterday (Tr. at 202-203).  When asked whether he is alert when he takes his pain medication, plaintiff said, "I'm very knowledgeable about what I take and what I put in my body." (Tr. at 209-210).  When

18

questioned further about his ability to sit and watch a monitor versus dozing off, plaintiff said that he has no concentration and he needs to put post-it notes on his desk or he will not remember things (Tr. at 210).

Plaintiff also suffers from cervical disc disease with radiculopathy and irritable bowel syndrome (Tr. at 201). The neck problems cause him to have to lie down after about ten hours because the weight of his head causes pain (Tr. at 203). If he lifts something that aggravates his neck pain, he may have to lie down after being up for two hours (Tr. at 203). Plaintiff was last treated for his neck in 2005[10] (Tr. at 217). Due to his irritable bowel syndrome, plaintiff uses the bathroom once a day, but when he is nervous, he may use the bathroom two to three times per day (Tr. at 201). Sometimes he has to use the bathroom as many as five times per day (Tr. at 202). In 2006 and 2007 plaintiff suffered from diarrhea a couple of times a week (Tr. at 218).

Plaintiff's hands get cold and they hurt (Tr. at 208). Plaintiff uses his hands repeatedly, but he could not do that for eight hours per day (Tr. at 208-209). He could use his hands repeatedly for an hour at a time (Tr. at 209). If he had to do

_____

[10]Plaintiff said he lost his insurance and could not pursue medical care for his neck; however, earlier he testified that he has Medicaid.

19

something like moving cans from one place to another, he could do that for at least 20 minutes (Tr. at 209).

Plaintiff takes his sleeping medications anywhere from midnight to 2:00 a.m. because he goes to bed around 2:00 a.m. (Tr. at 204, 222). It sometimes takes him about two hours to fall asleep (Tr. at 204). Plaintiff sleeps until anywhere from noon to 2:00 in the afternoon (Tr. at 221-222). Plaintiff lives alone and takes care of himself (Tr. at 204). He can cook casseroles and burgers, and he usually tries to cook several meals at once (Tr. at 204-205). He does his own cleaning and laundry (Tr. at 205). Plaintiff is a musician and plays in a band (Tr. at 219). Plaintiff played with his band at his house the night before the administrative hearing (Tr. at 219, 227). Plaintiff can play a guitar for up to an hour and a half at a time (Tr. at 219).

Plaintiff lies down to rest for anywhere from 30 minutes to two hours twice a day (Tr. at 205). When he is not lying down, he is usually sitting in a chair with his feet propped up (Tr. at 205). About once a month, plaintiff goes out with friends and plays music (Tr. at 206). Otherwise he stays at home because his budget does not allow him to go out (Tr. at 206). Plaintiff gets up about every 20 minutes to move around (Tr. at 206). He uses a treadmill and a Health Rider when he can (Tr. at 27). On a

Health Rider plaintiff pushes and pulls with his feet, and he tries to do 40 pulls (Tr. at 215). Each repetition causes plaintiff to pull his body weight with his feet (Tr. at 216). Plaintiff can stand for about 20 minutes (Tr. at 207). He walks on the treadmill for about 15 minutes at a time, then he lies down for an hour (Tr. at 207-208). Plaintiff exercises because his doctors have told him that is the best thing for fibromyalgia, and he tries to do it every day (Tr. at 208, 215).

Plaintiff does his own grocery shopping (Tr. at 208). He can carry a gallon of milk and a sac of groceries at one time (Tr. at 208). He currently works fixing guitar amplifiers for musicians (Tr. at 210). In order to do that, he uses small tools and small pieces of wire (Tr. at 220). He works on about two amps per week (Tr. at 211). He works for an hour, then rests for about a half an hour (Tr. at 211). He makes about $325 per month (Tr. at 211). He also gets food stamps and Medicaid (Tr. at 212).

Plaintiff's last job was electronics repair (Tr. at 213). He had to use small tools and small pieces of wire, and he would maneuver his hands and screw things in (Tr. at 213).

## 2. Vocational expert testimony.

Vocational expert Amy Salva testified at the request of the Administrative Law Judge. The first hypothetical involved a

Case 4:08-cv-00733-REL   Document 13   Filed 10/20/09   Page 21 of 35

person who can do a full range of light work except he must do
only simple, routine, repetitive work; cannot repetitively turn
his neck; can occasionally bend; can never crawl, kneel or
crouch; can not lift from floor level; and can use fine dexterity
but cannot repetitively use his hands (Tr. at 227-228). The
vocational expert testified that such a person could not perform
any of plaintiff's past relevant work; however, he could be a
ticket taker (D.O.T. 344.667-010) with 900 jobs in Missouri and
64,000 in the country, or he could be a sales attendant (D.O.T.
299.677-010) with 4,000 in Missouri and 125,000 in the country,
or he could be a retail marker (D.O.T. 209.587-034) with 5,000 in
Missouri and 260,000 in the country (Tr. at 228-229).

The second hypothetical involved a person with the
limitations described above but the person would need a sit/stand
option every 30 minutes (Tr. at 229). The vocational expert
testified that the person could be a ticket taker or a retail
marker but could not be a sales attendant (Tr. at 229).

The following questioning then occurred:

Q.    Now, in coming up with these 3 jobs in the hypothetical
      A, Ms. Salva, did you take into consideration each and
      every limitation that was placed on a light, exertional
      level?

A.    Yes.

Q.    And is it your professional opinion that this
      hypothetical person presented to you could perform
      these jobs?

22

A.   Yes.

Q.   And with the exception of the sit/stand option that I
put in Hypothetical B, does your testimony in any way
conflict with any provision of the DOT?

A.   No.

(Tr. at 229-230).

The vocational expert testified that a person who needed to
rest for a half an hour afer working for an hour would not be
able to work (Tr. at 230).  A person who could not sustain
concentration for two out of eight hours could not work (Tr. at
230).  A person who would need to lie down for an hour after
standing for 20 minutes would not be able to work (Tr. at 231).

## V.   *FINDINGS OF THE ALJ*

Administrative Law Judge William Horne entered his opinion
on January 18, 2008 (Tr. at 15-22).

Step one.  Plaintiff has not engaged in substantial gainful
activity since his alleged onset date (Tr. at 17).

Step two.  Plaintiff suffers from a disorder of the back and
neck and fibromyalgia, which are severe impairments (Tr. at 17).

Step three.  Plaintiff does not have an impairment or
combination of impairments which meet or equal a listed
impairment (Tr. at 17).

Step four.  Plaintiff retains the residual functional
capacity to perform light work except due to long-term narcotic

use, work must be something simple, routine, repetitive; no repetitive turning of the neck; only occasional bending; no crawling, kneeling, or crouching; no lifting from floor level; can do fine dexterity, but no repetitive use of hands and must be allowed to alternate between sitting and standing every 30 minutes (Tr. at 18). With this residual functional capacity, plaintiff cannot perform his past relevant work (Tr. at 20).

Step five. Based on the testimony of the vocational expert, which is "consistent with the information contained in the Dictionary of Occupational Titles", the ALJ found that plaintiff can perform the jobs of ticket taker and retail marker, both of which exist in significant numbers (Tr. at 21). Therefore, plaintiff is not disabled (Tr. at 21).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible because the ALJ improperly evaluated the side effects of plaintiff's medication.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999);

24

McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally

25

states that the following factors should be considered:
Treatment, other than medication, the individual receives or has
received for relief of pain or other symptoms; and any measures
other than treatment the individual uses or has used to relieve
pain or other symptoms (e.g., lying flat on his or her back,
standing for 15 to 20 minutes every hour, or sleeping on a
board).

The specific reasons listed by the ALJ for discrediting
plaintiff's subjective complaints of disability are as follows:

> The objective medical evidence does not support a finding
> for disabling limitations. The evidence reveals that in
> October 2004 the claimant complained of pain in his fingers.
> It was noted that he had a second job as a musician. In
> fact, he stated that he wanted to stop working as a tech and
> just play a guitar. He has also complained of neck pain.
> In March 2005 he was diagnosed with cervical radiculopathy.
> However, a treatment note on April 25, 2005 revealed that
> there was no radicular pain between the neck and the hands.
> He had some tingling in the toes. He had been treated with
> epidural steroid injections without significant improvement
> and had undergone an exam by a rheumatologist. This did not
> reveal any evidence of arthritis. A cervical MRI taken in
> April 2005 revealed mild degenerative changes with bulging
> at C5-6 and slight bulging at C6-7.

> The claimant has been evaluated by several specialists
> including a neurosurgeon and a rheumatologist without a
> diagnosis. He has been treated with narcotic pain
> medication. In May 2005 he reported that a special pillow
> helped his neck quite a bit. The claimant saw Paul
> Katzenstein, M.D., a rheumatologist, on June 2, 2005.
> However, the exam was unremarkable and Dr. Katzenstein
> stated that he did not know what the claimant had.

> It is noted that there were no further significant treatment
> notes until December 2006. And the last treatment note was
> in August 2007. These examinations also were essentially

unremarkable.  However, on December 5, 2006, Dr. Stephen
Dorsch, reported that he had not previously seen the
claimant before.  He reported that the claimant had a
history of fibromyalgia and chronic fatigue which was
initially diagnosed in 2004.  This information was obtained,
howver, by the claimant.  Dr. Dorsch's exam revealed normal
muscle tone and strength and good range of motion.  There
was some lateral elbow tenderness bilaterally, posterior
wrist tenderness and leg pain. The neurological exam was
otherwise within normal limits as were subsequent
examinations.  On May 11, 2007 and on July 6, 2007 the
claimant reported that Lyrica helped his pain quite a bit.

It is noted that the two most recent exams in July and
August 2007 diagnosed the claimant with symptoms suggestive
of fibromyalgia.  Exams continued to be essentially normal
although in July 2007 he had positive tender points around
his epicondyle, rib, supraspinatus and trapezius.  The
record also revealed a lumbar spine MRI taken in December
2004 which revealed multilevel degenerative changes and
bulging discs.  However, there were no specific complaints
of low back pain.

. . .  It is noted that no physician of record has opined
that the claimant was . . . disabled from all work activity.
In fact, no restrictions were placed on his activity.
Although he alleges significant hand pain, he testified that
he continued to play his guitar and repair amplifiers using
small tools.  He lives alone and is able to maintain his
residence.  The record does not establish a diagnosis for
irritable bowel disease and it is noted that the diagnosis
of fibromyalgia seems to be in question.

After considering the evidence of record, the undersigned
finds that the claimant's medically determinable impairments
could reasonably be expected to produce the alleged
symptoms, but that the claimant's statements concerning the
intensity, persistence and limiting effects of these
symptoms are not entirely credible.

(Tr. at 19-20).

    Plaintiff testified that his medications cause problems with

thinking, memory loss, and lack of concentration.  However,

Case 4:08-cv-00733-REL   Document 13   Filed 10/20/09   Page 27 of 35

plaintiff never reported any of these side effects to any
treating physician.

The medical records show that plaintiff was using Ultracet,
a narcotic-like pain reliever, as far back as mid-October 2004.
At that time he was still able to work despite being on this
medication. His alleged onset date is March 14, 2005. On June
2, 2005, he was alert and oriented, and reported having no
trouble playing the guitar. On June 7, 2005, he was alert and
oriented. In a Function report dated June 21, 2005, he wrote at
length by hand and reported that he was able to read, prepare
meals, watch television, do laundry, play guitar, type on his
computer, bathe, dress, drive, cook, wash dishes, shop for
groceries, do yard work, mow his lawn, ride a bicycle, walk
without an assistive device, pay bills, count change, handle a
savings account, use a checkbook, cooperate with others, follow
instructions without difficulty, write music, follow written
instructions "very well," handle stress "well," and handle
changes in routine "pretty well." He reported that his pain
pills make him cranky and short tempered, but he did not state
that any of his medications caused problems with thinking,
memory, or concentration.

Shortly thereafter, plaintiff's application for benefits was
denied and he went a year and a half without seeking medical

treatment.  On December 5, 2006, he reported no side effects from his medication which included the narcotic hydrocodone.  On January 2, 2007, he said he stopped taking amitriptyline because it blurred his vision, yet in subsequent medical records he continued to take it and reported that it worked well.  On March 13, 2007, he reported no side effects; on March 19, 2007, he was alert and oriented and did not report any side effects; on July 6, 2007, he did not report side effects.

In a Disability Report dated October 27, 2007, plaintiff reported that his medications caused sleepiness, dizziness, stomach discomfort, constipation, and erectile dysfunction, but they were effective at relieving his pain and he was still able to work as an amplifier repair technician.  These side effects are clearly very different from the side effects he reported at his administrative hearing, and none of these side effects were reported to his doctors either.  In fact, plaintiff was taking amitriptyline to help him sleep, which is entirely inconsistent with suffering from drowsiness.

Clearly the record as a whole contradicts plaintiff's claim that he suffers from disabling side effects, or frankly any side effects at all.  If plaintiff suffered from medication side effects, the record establishes that they were very minimal as plaintiff failed to report any to his treating doctors.

29

Based on the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding on this issue.[11]

## VII. *VOCATIONAL EXPERT TESTIMONY*

Next plaintiff argues that the ALJ erred in adopting the testimony of the vocational expert without any explanation as to the conflicts between her testimony and the Dictionary of Occupational Titles.

In determining whether a claimant can perform any work in the national economy, an ALJ may rely on the descriptions of jobs provided in the Dictionary of Occupational Titles or a description of jobs by a vocational expert.  20 C.F.R. § 404.1566.  "If the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, we may use the services of a vocational expert or other specialist."  20 C.F.R. § 404.1566(e).

Social Security Ruling 00-4p explains the process for resolving conflicts between the testimony of a vocational expert and the Dictionary of Occupational Titles:

> Occupational evidence provided by a VE [vocational expert] or VS [vocational specialist] generally should be consistent with the occupational information supplied by the DOT [Dictionary of Occupational Titles]. When there is an

---

[11]Additionally, in his reply brief, plaintiff abandoned this issue.  See reply brief at page 2.

apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

The cases cited by plaintiff to support his position that "where the DOT and the VE testimony conflict, the DOT controls" all rely on authority which pre-dates the issuance of SSR 00-4p (December 4, 2000). Although Raque v. Astrue, 2008 WL 1990801, was decided in 2008, the cases cited to support the finding that the DOT controls when there is a conflict were all decided prior to the issuance of SSR 00-4p. The purpose of SSR 00-4p was listed as follows: "Questions have arisen about how we ensure that conflicts between occupational evidence provided by a VE or a VS and information in the DOT (including its companion publication, the SCO) are resolved. Therefore, we are issuing this ruling to clarify our standards for identifying and resolving such conflicts." As quoted above, SSR 00-4p specifically states that neither the DOT nor the testimony of a vocational expert "trumps."

Case 4:08-cv-00733-REL   Document 13   Filed 10/20/09   Page 31 of 35

We turn then to the issue of whether the testimony of the vocational expert did in fact conflict with the DOT. If the testimony (with the exception of the testimony about the sit/stand option, to which plaintiff does not object) conflicts with the DOT, it was the ALJ's duty to obtain an explanation for that conflict and determine whether to accept the testimony or the information in the DOT. "When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p.

Plaintiff argues that the ALJ found that plaintiff could not use his hands repetitively, yet both jobs he said plaintiff could perform require repetitive or short-cycle work and frequent handling. As defendant points out, however, the ALJ found that plaintiff could perform "simple, routine, repetitive work" which is consistent with the DOT's description of repetitive, short-cycle work.

More problematic, however, is the ALJ's finding that plaintiff can perform frequent handling without repetitive use of his hands. Defendant cites Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007), to support his argument that frequent handling

32

requirements are "not equivalent to repetitive use."  However,
the plaintiff in <u>Renfrow</u> was precluded from repetitively using
only her right hand, and the court found that frequent handling
requirements were not equivalent to "repetitive use of the right
hand."  In this case, the ALJ did not limit the restriction to
only one of plaintiff's hands.

In <u>Davis v. Astrue</u>, 2008 WL 2872214 (W.D. Va.), the court
held that:

> [T]he few security guard and information clerk jobs listed
> in the DOT that are unskilled require frequent handling
> and/or fingering, which does not comply with the ALJ's
> request to exclude jobs that require repetitive work with
> hands.  The ALJ did not identify or explain these conflicts
> between the vocational expert's testimony and the DOT
> despite being required to do so by Social Security Ruling
> 00-4p.  Therefore, the ALJ was not justified in relying upon
> the vocational expert's testimony to support a determination
> of nondisability.  Accordingly, the ALJ's decision that
> Davis is not disabled because she can perform work that
> exists in the national economy is not supported by
> substantial evidence and this case must be remanded to the
> ALJ to explain the inconsistency in the vocational expert's
> testimony before he may rely upon it.

<u>See also</u> <u>Jeffries v. Commissioner of Social Security</u>, 23 Fed.
Appx. 351 (6th Cir. 2001) (limitation in repetitive use of the
hands for fine manipulation prevents the performance of work as a
ticket taker); <u>Adams v. Astrue</u>, 2007 WL 4358344 (W.D. Va., 2007)
(claimant can work as a ticket taker despite inability to perform
work that requires repetitive use of the hands).

But in <u>Flores v. Astrue</u>, 2009 WL 1562854 (S.D.N.Y.,2009), it was held that the claimant could work as a ticket taker despite difficulty using her hands and wrists against resistance, inability to engage in repetitive fine fingering activities, and inability to do more than a limited amount of repetitive grasping.

I have carefully read the transcript of the vocational expert's testimony, and I have found that the ALJ did not obtain an explanation from the vocational expert as to the conflict between her testimony (that a person could be a ticket taker or a retail marker if he is unable to repetitively use his hands) and the Dictionary of Occupational Titles (that a ticket taker and a retail marker must be able to frequently handle). I further find that since there was no explanation at all, the ALJ failed to determine if the explanation for the conflict was reasonable and provided a basis for relying on the vocational expert testimony rather than on the information in the Dictionary of Occupational Titles. It appears that the ALJ gave plaintiff a huge benefit of the doubt on this issue, as the ALJ commented during the hearing that plaintiff was able to play his guitar and use small tools and small wire repairing amplifiers. "I'm going to give it to him anyway, okay?" (Tr. at 227). There does not appear to be much if any evidence in the record to support such a restriction,

34

but that is the restriction found by the ALJ in his residual functional capacity determination.

## VIII. CONCLUSIONS

Based on all of the above, I find that the ALJ erred in relying on the testimony of the vocational expert without first obtaining an explanation from the vocational expert as to how a person limited in his ability to use his hands repetitively could perform a job that requires frequent handling. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied, but his alternative remedy of remand is granted. It is further

ORDERED that the decision of the Commissioner is reversed and this case is remanded so that the ALJ may explain the inconsistency in the vocational expert's testimony before relying upon it.

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 20, 2009